# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

VIRGINIA C. KASPAR,

    Plaintiff,

    vs.                                        No. CIV 99-0262 JC/LFG (ACE)

CITY OF HOBBS, et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER came on for consideration of Defendants' Motion to Bifurcate Municipal and Supervisory Liability Claims from Personal Liability Claims for Trial, filed November 18, 1999 *(Docs. 58, 59)* ("Motion to Bifurcate"), and Plaintiff's Motion for Partial Summary Judgment against Defendants Durham and Lamb, filed November 24, 1999 *(Doc. 66)* ("Plaintiff's Motion"). The Court has reviewed the motions, the memoranda and exhibits submitted by the parties, and the relevant authorities. The Court finds that Plaintiff's Motion is well taken in part and will be granted in part, and that Defendants' Motion to Bifurcate will be denied as moot.

Plaintiff moves for "summary judgment against Defendants Durham and Lamb for their warrantless search of [Plaintiff's] home or, in the alternative, against Defendant Durham for the search of [Plaintiff's] bedroom." Pl.'s Mem. in Supp. of Pl.'s Mot., filed Nov. 24, 1999 *(Doc. 66)* at 3. Plaintiff assumes, only for the purposes of arguing her motion, that all contested issues of fact are as the defendants assert them. Accordingly, unless otherwise noted, the following facts are undisputed or are as represented by Defendants.

**I.    Factual Background**

On the night of March 13, 1997, Defendants Durham and Lamb conducted a warrantless search of Plaintiff Virginia Kaspar's home at 609 North Houston in Hobbs, looking for a man named

"George." Plaintiff was in bed during the search, and neither officer requested her permission to enter her home. However, Defendant Durham contends that he obtained consent to search from Pete Losoya, a friend of Plaintiff's who assists Plaintiff with various household chores.

Sometime after 10:00 p.m., on March 13, 1997, Defendants Durham and Lamb were among at least six police officers who responded to a report of a fight in the area of 508 North Houston. Defendant Durham said he heard a man tell Officer Hargrove that he had been in a fight with "George," and that George ran down the street and possibly into a little white house on the other side of the street. According to Defendant Lamb, Officer Randle told him that the fight suspect ran down the street into 607 North Houston. Defendant Durham walked towards Plaintiff's house with another officer,[1] and saw a man standing in the doorway of Plaintiff's home. Defendant Durham explained that they were looking for "George," and asked the man for his name. The man identified himself as "Pete" (Pete Losoya). When Defendant Durham asked Mr. Losoya if George had run into the house, he responded that he "didn't think no George ran into the residence." Durham Dep. at 201, Ex. 3 attached to Pl.'s Mot.

When Defendant Durham asked Mr. Losoya if he lived at Plaintiff's house, Mr. Losoya replied that he "stays there sometimes, taking care of the lady that lives at the house." Durham Dep. at 202, Ex. 3 attached to Pl.'s Mot. Defendant Durham then asked Mr. Losoya if he "would let us look to make sure George hadn't run into the house."[2] *Id.* at 206. Defendant Durham could not recall whether Mr. Losoya said "come on in," or "just turned, and opened the door and walked right in . . . . and held out his hand." Durham Dep. at 207, Ex. A attached to Defs.' Resp. to Pl.'s Mot.,

---

[1] Defendant Durham does not remember the identity of the officer who walked with him to Plaintiff's house. Defendant Lamb states that he joined Defendant Durham after he and two other officers completed a search of the house at 607 North Houston.

[2] Defendant Durham also testified that he asked Mr. Losoya if he "would let me do a quick check and make sure [George] wasn't in there." Durham Dep. at 206, Ex. 3 attached to Pl.'s Mot.

filed Dec. 8, 1999 *(Doc. 81)* ("Defendants' Response").[3] Defendant Lamb saw Mr. Losoya wave towards Plaintiff's house and say "sure, come on" or "words to that effect," but did not hear any other conversation between Defendant Durham and Mr. Losoya. Lamb Dep. at 83-86, Ex. 2 attached to Pl.'s Mot. Defendant Durham's conversation with Mr. Losoya lasted for approximately 30 to 60 seconds and no further conversation occurred between the two men. Defendant Durham testified that Mr. Losoya "led us through the house." Durham Dep. at 207, Ex. A attached to Defs.' Resp. Defendant Lamb claims that he entered Plaintiff's home after Defendant Durham.

Plaintiff contends that any consent Mr. Losoya may have given was invalid because he lacked either actual or apparent authority to consent. Plaintiff further claims that the officers exceeded the scope of the search by searching drawers, cabinets and other places where a person could not hide. Plaintiff asserts that the search shocked and distressed her, caused her to no longer feel safe in her home, and left her unable to sleep. She further claims that after the search she needed several days to "put her house back together" which increased the pain she suffers from a "physical condition." Plaintiff's Compl., filed March 11, 1999 *(Doc. 1)* ¶ 21.

## II. Standard of Review

Summary judgment should be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party

---

[3] Hobbs Police Department guidelines recommend the use of written consent forms when possible under the circumstances. Officer Durham did not ask Mr. Losoya to sign a written consent form.

-3-

must identify sufficient evidence" that would justify sending the case to a jury. *See Williams v. Rice*, 983 F.2d 177, 179 (10th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986)).

**III. Discussion**

The consent of a third party to a search of a common premises is valid if the consenting party possesses either actual or apparent authority to consent to the search. *See United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230 (10th Cir. 1998) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). Plaintiff contends that the defendant officers conducted an unlawful search because Mr. Losoya did not have actual or apparent authority to consent to a search of Plaintiff's home.

### *A. Actual Authority (or common authority)*

The test of a third party's actual authority is "whether the third party has 'mutual use of the property[,] . . . generally ha[s] joint access or control for most purposes[,] . . . and [whether] the others have assumed the risk that one of their number might permit the common area to be searched.'" *Gutierrez-Hermosillo*, 142 F.3d at 1230 (citing *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974); *see United States v. McAlpine*, 919 F.2d 1461, 1463-64 (10th Cir. 1990)). In the Tenth Circuit, this test is disjunctive, that is, "a third party has actual authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999).

#### *1. Joint Access*

Establishing the first prong, joint access, is a fact-intensive inquiry that requires the court to find "that the third party entered the premises or room at will, without the consent of the subject of the search." *Rith*, 164 F.3d at 1329-30. In *Rith*, the court determined that there were insufficient factual findings that the defendant's parents had the necessary joint access to establish their authority

to consent to a search of the defendant's room. The court specifically cited a lack of findings that the defendant's parents "visited with him in his room, cleaned his room, or otherwise went into [the defendant's] room *uninvited*." *Rith*, 164 F.3d at 1331 (emphasis added).[4] In another case, a fact situation similar to the one here prompted the United States Supreme Court to state that the lower court's "determination [that the defendant's girlfriend had] no common authority over the apartment was obviously correct." *Illinois v. Rodriguez*, 497 U.S. 177, 182 (1990). The girlfriend in *Rodriguez* had moved out of the defendant's apartment almost a month before the search at issue, taking some of her possessions with her. The girlfriend was not named on the lease nor did she pay rent. Although she sometimes spent the night at the defendant's apartment, she did not invite friends there or visit there when the defendant was not home. She had a key to the defendant's apartment, although she may have taken it without the defendant's knowledge. Given these facts, the Supreme Court upheld the lower court's finding that the defendant's girlfriend lacked common authority over the defendant's apartment. *See also Petersen v. People*, 939 P.2d 824, 828-29 (Colo. 1997) (one dissenting) (finding that a non-resident caretaker with limited duties did not possess common authority).

The uncontroverted evidence in this case establishes the following: Plaintiff lives alone at 609 North Houston, Plaintiff is listed on the lease as the sole occupant of the house, Mr. Losoya never lived with Plaintiff at the house, Mr. Losoya never had a key to Plaintiff's house, Mr. Losoya never entered Plaintiff's house without her permission, Mr. Losoya never entered Plaintiff's house in her absence, and Mr. Losoya never let anyone into the house that Plaintiff did not know without

---

[4] The *Rith* court found that the parents had authority to consent to a search of their son's room based on an unrebutted presumption of control for most purposes over the entire home. *Rith*, 164 F.3d at 1331.

her permission. Moreover, no evidence indicates that Mr. Losoya kept any personal possessions or furniture at Plaintiff's house or paid any rent to Plaintiff.

The evidence that Defendants present in an attempt to contradict the findings above is either immaterial, irrelevant, fails to dispute the findings, or is inconsequential. For example, Defendants point out that Mr. Losoya once obtained Plaintiff's key from her landlord to enter Plaintiff's house. However, Mr. Losoya had Plaintiff's permission to obtain the key on this occasion in order to retrieve some papers from Plaintiff's house while she waited outside in a car. While this incident may indicate that Mr. Losoya performed an errand or favor for Plaintiff, it fails to dispute the fact that Mr. Losoya never had a key to Plaintiff's house. Similarly insignificant is the fact that Mr. Losoya, in his role as Representative Payee, was a signatory on Plaintiff's lease and paid her utilities and rent as part of the administration of Plaintiff's social security benefits. There is no evidence that Mr. Losoya ever paid rent, utilities, or any other expenses associated with Plaintiff's house from his personal funds.

Defendants' assertion that Mr. Losoya let people in Plaintiff's house without her permission overstates the evidence. Plaintiff testified that "a few times" Mr. Losoya let his brother or sister into Plaintiff's house without specifically asking Plaintiff. On those occasions, however, Mr. Losoya knew it was all right because Plaintiff also knew these individuals. Moreover, Defendants do not dispute Plaintiff's testimony that Mr. Losoya usually did not let anyone in without Plaintiff's permission. More importantly, Defendants offer no facts to contradict Plaintiff's testimony that Mr. Losoya asked her permission before letting anyone she did not know into the house. Under these circumstances, the fact that Mr. Losoya allowed his brother or sister into Plaintiff's house a few times without Plaintiff's explicit permission does not demonstrate that Mr. Losoya had the authority to freely invite guests into Plaintiff's home. On the contrary, the evidence indicates that if Mr. Losoya had any authority to allow people into Plaintiff's home, it was limited to only those persons that Plaintiff

already knew. Likewise, the fact that Mr. Losoya frequently calls out "Virginia, it's me" and then enters Plaintiff's home, fails to indicate that Mr. Losoya has joint access to the property. On those occasions where Mr. Losoya calls out before entering Plaintiff's home, Plaintiff is already expecting Mr. Losoya's arrival. Moreover, the fact that Mr. Losoya announces his presence before going into Plaintiff's house tends to demonstrate that he does not have the authority to enter Plaintiff's premises at will without her consent.

Defendants also contend that on the night of the search, Mr. Losoya moved about Plaintiff's house "with unfettered discretion." In support of this contention Defendants present testimony that Mr. Losoya fixed himself a cup of coffee, entered Plaintiff's bedroom, and answered the door. The testimony indicates that, not including the search, Mr. Losoya entered Plaintiff's bedroom twice; once with Plaintiff's permission to use the telephone and again, soon after the police officers completed their search. Mr. Losoya likewise answered the door twice; once when his brother knocked, and again, when Defendant Durham knocked.[5] Although these facts may indicate that Mr. Losoya enjoyed a limited degree of movement within Plaintiff's house, they fall far short of establishing unfettered discretion. In any case, whatever this evidence may imply regarding Mr. Losoya's discretion *within* Plaintiff's residence, it does not demonstrate that Mr. Losoya entered Plaintiff's residence at will without the consent of Plaintiff.

Finally, Defendants point to the testimony of Ms. Davis, a neighbor of Plaintiff, claiming that it calls into doubt the credibility of both Plaintiff and Mr. Losoya.[6] While Ms. Davis' allegations may raise questions regarding Plaintiff's character, they fail to provide contradictory evidence regarding

---

[5] Defendant Durham testified that Mr. Losoya was standing in the doorway when he approached Plaintiff's house. Here, Defendants rely on Mr. Losoya's testimony that he answered a knock on the door.

[6] Ms. Davis testified that Plaintiff asked for half of Ms. Davis' witness fee, and that Plaintiff told Ms. Davis, "If you do me right at this deposition, I'll make it right with you." Davis Dep. at 10:17-11:2, Ex. D attached to Defs.' Resp.

any of the findings established above. Moreover, Ms. Davis' testimony does not address Mr. Losoya or his testimony at all. After reviewing the relevant case law and considering the evidence in the light most favorable to Defendants, I find that the evidence demonstrates that at the time of the search, Mr. Losoya did not have the mutual use of Plaintiff's house by virtue of joint access.

### 2. *Control for Most Purposes*

Establishing the second prong, control for most purposes, requires a normative inquiry into "whether the relationship between the [subject of the search] and the third party . . . creates a presumption of control for most purposes over the property by the third party." *Rith*, 164 F.3d at 1330. While parent-child and husband-wife relationships give rise to a presumption of control over property, a simple co-tenant relationship does not. *See id.* The presumption of control may be rebutted by facts indicating that the third party needed the permission of the other individual to enter the searched premises. *See id.* at 1331. Plaintiff and Mr. Losoya are not married, nor do they share any familial relationship. Although they have lived together as girlfriend and boyfriend in the past, Defendants concede that any romantic relationship between Plaintiff and Mr. Losoya ended by 1992. Moreover, no evidence suggests that Plaintiff and Mr. Losoya ever resided together at Plaintiff's house. The relationship between Plaintiff and Mr. Losoya does not create a presumption of control over Plaintiff's premises. However, even if their relationship raised a presumption of control, the evidence discussed above sufficiently demonstrates that Mr. Losoya needed Plaintiff's permission to enter the premises. Thus, Plaintiff effectively rebuts any presumption of control created by her relationship with Mr. Losoya.

The material facts in this case demonstrate that Mr. Losoya lacked either mutual use by virtue of joint access or a presumption of control over Plaintiff's home. Accordingly, I find that Mr. Losoya lacked actual authority to consent to a search of Plaintiff's home. However, the analysis does not end

with a finding that Mr. Losoya lacked actual authority. That is because Mr. Losoya's consent would still be valid if the officers reasonably relied on his apparent authority to consent.

### B. *Apparent Authority*

Officers conducting a warrantless search do not violate the Fourth Amendment "when they reasonably, although *erroneously*, believe that the person who consents to their entry has the authority to consent to this entry." *Gutierrez-Hermosillo*, 142 F.3d at 1230 (citing *Rodriguez*, 497 U.S. at 186-88; *United States v. Rosario*, 962 F.2d 733, 736 (7th Cir. 1992) (emphasis added)). Plaintiff claims that under the facts as presented by Defendants, the officers could not reasonably rely on the apparent authority of Mr. Losoya to consent to a search of Plaintiff's house or her bedroom.

In order to determine whether Mr. Losoya had apparent authority to consent, I will consider the evidence available to Defendant Durham at the time he believed Mr. Losoya gave consent to enter Plaintiff's premises. Defendant Durham first observed Mr. Losoya standing in the doorway of Plaintiff's house. After establishing that Mr. Losoya was not George, Defendant Durham asked Mr. Losoya if he lived at Plaintiff's house. Mr. Losoya replied that he "stays there sometimes, taking care of the lady that lives at the house." Durham Dep. at 202, Ex. 3 attached to Pl.'s Mot. There is nothing in Mr. Losoya's statement from which a police officer could reasonably infer that Mr. Losoya is a resident or co-tenant of Plaintiff's house. On the contrary, the fact that Mr. Losoya failed to respond with a "yes" when Defendant Durham asked him if he lived at Plaintiff's house raises doubt regarding his residency there. Mr. Losoya referred to Plaintiff as "the lady who lives at the house," while indicating only that he "stays there sometimes," thus reinforcing the inference that Mr. Losoya did not live at the premises. Mr. Losoya's statement communicated to Defendant Durham his understanding that Plaintiff lived at the house and that he, Mr. Losoya, did not.

Accordingly, I find that a reasonable person could not conclude from Mr. Losoya's statement that he was a resident or co-tenant of Plaintiff's house.

It is possible that Mr. Losoya's response may have presented Defendant Durham with an ambiguous picture of Mr. Losoya's authority to consent to a search. However, ambiguity regarding a person's ability to consent triggers a police officer's obligation "to conduct further factual inquiry before relying on a grant of third-party consent." *Petersen*, 939 P.2d at 831 (citing *Rodriguez*, 497 U.S. at 188). In order to decide if Mr. Losoya had the apparent authority to consent to a search of Plaintiff's house, *Rodriguez* requires a determination of whether "the facts available to [Defendant Durham] at the moment . . . [would] warrant a man of reasonable caution in the belief that [Mr. Losoya] had authority over the premises[.]" *Rodriguez*, 497 U.S. at 188 (internal quotations omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). "If not, then warrantless entry without further inquiry is unlawful unless authority *actually* exists." *Id.* at 188-89 (emphasis added).

Defendant Durham conducted no further inquiry into Mr. Losoya's authority to consent to a search. Nothing in Mr. Losoya's statement indicated that "the lady who live[d] at the house" was absent, yet neither officer requested to speak with Plaintiff. The officers did not ask Mr. Losoya about his relationship to Plaintiff, nor what duties were involved in caring for her. Neither did the officers inquire into the extent of Mr. Losoya's access to the premises. Defendant Durham observed Mr. Losoya standing in the doorway of Plaintiff's house. During a brief conversation, Defendant Durham learned Mr. Losoya's first name and that he "stay[ed] there sometimes, taking care of the lady who lives at the house." Based solely on this information, Defendant Durham relied on Mr. Losoya's authority to consent to a search of Plaintiff's home. This information is an insufficient basis for Defendant Durham to *reasonably* believe that Mr. Losoya could enter Plaintiff's premises

at will, or to *reasonably* presume that Mr. Losoya had control for most purposes over Plaintiff's property.

However, a generous interpretation of Mr. Losoya's response might allow Defendant Durham to reasonably assume that Mr. Losoya was assisting Plaintiff in the capacity of a non-resident, part time caretaker.[7] Thus, if a non-resident, part-time caretaker has actual authority to consent to a search, then Defendant Durham acted reasonably in relying on Mr. Losoya's apparent authority and would be entitled to qualified immunity.

### C. *Qualified Immunity*

I note that if Mr. Losoya had possessed actual authority to consent to a search of Plaintiff's home, the Court would not need to address the question of qualified immunity or apparent authority. That is because the issue of whether the officers acted reasonably in assuming that Mr. Losoya had authority would be mooted by the fact that he did. I also note that to determine whether Mr. Losoya had apparent authority to consent also determines whether Defendant Durham is entitled to qualified immunity. That is because the concepts of apparent authority and qualified immunity similarly focus on whether an officer acted reasonably in light of the legal standards in place at the time of the alleged violation. *See Gutierrez-Hermosillo*, 142 F.3d at 1230 (citing *Rodriguez*, 497 U.S. at 185-89) (finding that apparent authority exists where officers reasonably believe that the person who consents to their entry has the [actual] authority to do so); *Melton v. City of Oklahoma City*, 879 F.2d 706, 727 (10th Cir. 1989) (overruled on other grounds) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)) ("The key to the [qualified immunity] inquiry is the objective reasonableness of the official's conduct in light of the legal rules that were clearly established at the time the action was taken."). I will therefore determine whether Defendant Durham acted reasonably in relying on Mr. Losoya's

---

[7] From Mr. Losoya's statement, it is impossible to discern the nature or extent of his caretaker duties.

authority to consent in light of the clearly established law at the time of the search concerning actual authority.

Defendants claim that qualified immunity protects the officers, and cite three cases as support for their contention that the officers were acting in accordance with clearly established law. However, their cited cases are not applicable to the circumstances of this case. In *United States v. Rosario*, 962 F.2d 733 (7th Cir. 1992), officers knocked on the door of a motel room that they knew was registered to a man by the name of Estrada. However, the door was answered by another man named Vilaro. In determining that the officers reasonably relied on Vilaro's apparent authority to consent to a search of the motel room, the court explained that when Vilaro opened the door "the officers had no reason to suspect that the room was occupied by more than one person." *Id.* at 737. Although Estrada was seated at a table inside the room, the court also noted that he did not approach the door or object to the officers' entry. "In short," the court found that "nothing about the interaction between Vilaro and the officers . . . could have undermined a reasonable person's impression that Vilaro was vested with the power to allow whomever he pleased" into the motel room. *Id.*

In contrast to the facts of *Rosario*, Mr. Losoya's statement clearly indicated to Defendant Durham that more than one person was likely present in the house. Moreover, it also served to undermine the perception of Mr. Losoya's authority by highlighting the fact that Plaintiff was a resident and that Mr. Losoya merely "stayed there sometimes." Finally, Plaintiff was in bed when Defendant Durham spoke with Mr. Losoya and was not immediately aware of the events transpiring at her front door. Thus, Plaintiff did not have the same opportunity to approach the door or object to Defendant Durham's entry. The *Rosario* officers were not required to conduct further inquiry because they were not faced with any information that challenged their reliance on Vilaro's apparent

authority. In this case, however, Mr. Losoya's statement raised questions that demanded further inquiry before an officer could reasonably rely on his authority to consent to a search of Plaintiff's house.

*Fredericks v. Wright*, 46 F.3d 1141 (9th Cir. Jan. 20, 1995) (unpublished table decision), *available at* No. 94-35494, 1995 WL 23651 is similarly inapplicable to this case. The *Fredericks* court addressed the authority of a guest to admit officers into the foyer of a resident's home. *See id.* at **4. Here, Plaintiff complains of an unauthorized search of essentially her entire home. In *Fredericks*, the court found that the officers reasonably believed that a guest had the authority to consent to their entry, noting that the homeowner also came to the door shortly after the guest opened it and did not object to the officers' entry. *See id.* In this case, Plaintiff was in bed while Mr. Losoya and Defendant Durham talked at the front door and thus was not immediately available to confirm or deny Mr. Losoya's authority to consent to a search of her house. Plaintiff testified that while in bed she was "shocked awake," when one or more men with flashlights entered her bedroom. Under these circumstances and given the fact that Defendant Durham did not ask Plaintiff for permission to enter the bedroom, I find little significance in the fact that Plaintiff did not object when Mr. Losoya and Defendant Durham entered her bedroom.

In *Gutierrez-Hermosillo*, the court found that officers could reasonably rely on the authority of a fourteen-year-old girl to consent to a search of a motel room where the officers knew that the girl was traveling with her father. *See Gutierrez-Hermosillo*, 142 F.3d at 1231. In contrast, the officers in this case had no similar knowledge of the relationship between Plaintiff and Mr. Losoya. Thus, the findings of the *Gutierrez-Hermosillo* court are likewise inapplicable to the facts of the instant case.

The Tenth Circuit clearly established that for a third party to have "mutual use by virtue of joint access," he or she must be able to enter the premises at will, without the consent of the subject of the search. *See Rith*, 164 F.3d at 1329-30. *Rith* further held that certain relationships, such as husband and wife and parent and child, can create a rebuttable presumption of control for most purposes over the property. *See id.* at 1330-31. Given the standard for actual authority set forth in *Rith*, I find it doubtful that many non-resident babysitters or caretakers would be found to possess common authority to consent to a search. It is unlikely that a non-resident babysitter or caretaker would be permitted to enter another's home at will without the consent of the home's resident. Nor is it reasonable to assume that a non-resident third party enjoys control for most purposes over the property at issue, merely because the third party is a babysitter or caretaker. Thus, it would seem unreasonable for a police officer, lacking additional information, to believe that a non-resident caretaker possesses the authority to consent to a search of the resident's premises. *See, e.g.,* WAYNE R. LAFAVE, SEARCH AND SEIZURE § 8.3(g) (3d ed. 1996) (commenting on *People v. Misquez*, 313 P.2d 206 (Cal. Ct. App. 1957)) ("It is a perversion of the apparent authority doctrine, for example, to hold that the police may reasonably conclude that a person known to be a babysitter had the authority to permit a full search of the premises which she purported to have.") (internal quotations omitted).

Defendants claim that "a majority of courts have held that a baby sitter or care taker has sufficient authority to permit a police search." Defs.' Resp. at 12. However, the circumstances of the cases that Defendants cite are distinguishable from the instant case by one or more critical facts. In most cases, the third party babysitter or caretaker was a resident, or possessed a key and/or unlimited access to the premises searched. *See People v. Misquez*, 313 P.2d 206 (Cal. Ct. App. 1957); *State v. Perry*, 502 So.2d 543, 557 (La. 1986); *State v. Cook*, 411 P.2d 78 (Or. 1966).

In other cases, the consenting party possessed equal or superior rights to control of the property as compared to the subject of the search. *See Barrow v. State*, 221 S.E.2d 416 (Ga. 1975); *Butler v. Commonwealth*, 536 S.W.2d 139 (Ky. 1976). Here, Mr. Losoya was not a resident of Plaintiff's house and did not possess a key or have unlimited access to her home. Further, Plaintiff's rights as a resident to control her property far outweigh the rights of Mr. Losoya as a non-resident.

In *Petersen v. People*, 939 P.2d 824 (Colo. 1997), the Colorado Supreme Court stated that it "found no cases where non-resident caretakers were held to possess common authority over property." *Id.* at 827. While I do not completely agree with that statement,[8] I find it to be a generally correct assessment of the current state of the law regarding non-resident caretakers. That is, courts addressing the issue tend to find that a non-resident babysitter or caretaker lacks the authority to consent to a search except under circumstances indicating mutual use by virtue of joint access, or control for most purposes over the property. Generally, it is only where a babysitter or caretaker is also a resident of the premises that courts will find actual authority. *See, e.g., United States v. Dearing*, 9 F.3d 1428, 1430 (9th Cir. 1993); *Shue v. State*, 201 S.E.2d 174, 175 (Ga. 1973); *State v. Cook*, 411 P.2d 78, 81-82 (Or. 1966).

However, in *United States v. Thomas*, 120 F.3d 564 (5th Cir. 1997), the Fifth Circuit upheld a district court's finding that officers reasonably believed that a non-resident babysitter possessed the authority to consent to a search of an apartment. The district court in *Thomas* found that a babysitter's authority over the common areas of an apartment included the bedrooms and bathrooms, "*given [the babysitter's] description of what he was charged with doing*."[9] *Id.* at 572 (emphasis added). Although the Fifth Circuit highlighted the district court's finding that the babysitter of a

---

[8] *See, e.g., Perry*, 502 So.2d at 557 (finding that a caretaker with a key and ongoing permission to enter the property whenever he deemed necessary could give valid consent).

[9] The court found that the babysitter's authority did not extend to the closets and underneath the mattresses.

-15-

mentally impaired man "would have a right of access to and [] mutual use of the common areas," it did not hold that the babysitter possessed actual authority. *Id.* at 572. Instead, the appellate court concluded without further explanation that "the officers reasonably relied on [the babysitter's] *apparent* authority to consent to the[] search of the common areas of the apartment." *Id.* (emphasis added).

The facts of the instant case differ from those of *Thomas* in several important respects. For example, while the babysitter in *Thomas* was the "only remaining responsible adult" in the apartment, *id.* at 570, Defendant Durham had no reason to assume that Plaintiff was likewise incompetent to grant consent. The babysitter in *Thomas* had the authority to consent to a search given a description of his duties.[10] Here, Defendant Durham had no knowledge whatsoever of how Mr. Losoya "took care" of Plaintiff. Thus, it would appear that *Thomas* is not directly applicable to the facts of this case. However, by finding that a non-resident babysitter had *apparent* authority to consent to a search of common areas, the *Thomas* court implied that, at least in some situations, a non-resident caretaker may have *actual* authority to consent to a search of the common areas of a resident's property.

Given the holding of *Thomas,* and the fact that neither the Supreme Court nor the Tenth Circuit has directly addressed the authority of a non-resident caretaker under circumstances similar to those of the instant case, there is a question, however slight, regarding whether the law is clearly established on this issue. Therefore, *only under the facts as presented by Defendants*, I will extend the benefit of the doubt to Defendants Durham and Lamb and grant qualified immunity to the officers as to their search of the common areas of Plaintiff's premises, to include the living room and kitchen.

---

[10] Unfortunately, the court did not describe the babysitter's duties.

-16-

However, I cannot similarly grant Defendant Durham qualified immunity for his conduct in searching Plaintiff's bedroom. Mr. Losoya did not describe for Officer Durham the duties with which he was charged. Neither officer questioned Mr. Losoya concerning his duties or the extent of his access to the premises. Nor did the officers attempt to determine the relationship between Plaintiff and Mr. Losoya. Therefore, Defendant Durham lacked any reason to believe that Mr. Losoya had common authority over Plaintiff's bedroom. The mere fact that Mr. Losoya may have consented to the search of Plaintiff's bedroom is "insufficient to support a reasonable belief in [Mr. Losoya's] authority." *United States v. Salinas-Cano*, 959 F.2d 861, 866 (10th Cir. 1992) (finding that a girlfriend lacked the apparent authority to consent to the search of her boyfriend's suitcase located in the girlfriend's apartment, where the officers failed to determine the girlfriend's mutual use of the suitcase); *see also Dearing*, 9 F.3d at 1430 (finding that an officer could not reasonably rely on a live-in caretaker's apparent authority to consent to a search of a bedroom, based solely on the officer's knowledge that the caretaker had entered the bedroom on prior occasions). Given the circumstances, and in light of the officer's lack of knowledge regarding Mr. Losoya's authority over Plaintiff's bedroom, a reasonable police officer would have inquired further before searching Plaintiff's bedroom.

In sum, after considering all of the evidence and construing all inferences in favor of Defendants, I find that Defendant Durham could not reasonably believe that Mr. Losoya had authority to consent to a search of Plaintiff's bedroom. Having found that Mr. Losoya lacked actual authority to consent to a search of Plaintiff's house, and that Mr. Losoya also lacked apparent authority to consent to a search of Plaintiff's bedroom, I find that Defendant Durham violated Plaintiff's rights under the Fourth Amendment to the United States Constitution when he conducted a search of

Plaintiff's bedroom on the night of March 13, 1997. Accordingly, I will grant Plaintiff's motion for summary judgment against Defendant Durham as to his search of Plaintiff's bedroom.

*A Note on Agency Theory*

Finally, Plaintiff contends that Defendants attempted to create the impression that an employer-employee relationship exists between Plaintiff and Mr. Losoya. I find it unlikely that the facts of this case would support an argument that Mr. Losoya had the implied authority of Plaintiff to consent to a search of her home under an agency theory. However, because Defendants do not present this argument in either their response to this motion or in the parties' Pretrial Order, I will not discuss the issue.

### D. *Defendants' Motion to Bifurcate*

Defendants move the Court for an order "bifurcating the municipal liability and personal liability claims for trial." Defs.' Mot. to Bifurcate at 1. Defendants request that the supervisory and municipal liability claims be heard by the jury only upon a finding of personal liability. In this case, the Court has found personal liability on the part of Defendant Durham by granting part of the plaintiff's summary judgment motion. Consequently, because Defendants' argument for bifurcation is moot, their Motion for Bifurcation will be denied as moot.

## IV. Conclusion

Wherefore,

IT IS ORDERED that Plaintiff's Motion for Partial Summary Judgment against Defendants Durham and Lamb, filed November 24, 1999 *(Doc. 66)*, is **granted in part**.

IT IS ORDERED that Plaintiff's motion for summary judgment is **granted** against Defendant Durham on Plaintiff's claim pursuant to 42 U.S.C. § 1983 that Defendant Durham violated Plaintiff's

rights under the Fourth Amendment to the United States Constitution when he conducted a search of Plaintiff's bedroom on the night of March 13, 1997.

IT IS ALSO ORDERED that Plaintiff's motion for summary judgment is **denied** as to Plaintiff's claim pursuant to 42 U.S.C. § 1983 that Defendants Durham and Lamb, under the facts presented by Defendants and described in this Opinion, violated Plaintiff's rights under the Fourth Amendment to the United States Constitution when they conducted a search of Plaintiff's living room and kitchen on the night of March 13, 1997.

IT IS FURTHER ORDERED that Defendants' Motion to Bifurcate Municipal and Supervisory Liability Claims from Personal Liability Claims for Trial, filed November 18, 1999 *(Docs. 58, 59)*, is **denied** as moot.

DATED this 28th day of March, 2000.

_____
**CHIEF UNITED STATES DISTRICT JUDGE**


Counsel for Plaintiff:	Richard Rosenstock
	Santa Fe, New Mexico

	Debra Poulin
	Santa Fe, New Mexico

Counsel for Defendants:	Gregory L. Biehler
	Beall & Biehler, P.A.
	Albuquerque, New Mexico